STATE v. SPROUSE

[217 N.C. App. 230 (2011)]

STATE OF NORTH CAROLINA v. WILLIAM THOMAS SPROUSE

No. COA11-518

(Filed 6 December 2011)

**1. Sexual Offenses—anal intercourse—evidence of penetration—sufficient**

The trial court did not err by denying defendant's motion to dismiss charges of statutory sex offense and sexual activity by a substitute parent where the charges were based on an alleged incident of anal intercourse, defendant contended that there was insufficient evidence of penetration, and the victim testified that there was slight penetration, that the incident was painful, and that she cleaned blood from herself afterwards.

**2. Witnesses—sequestration denied—testimony not conformed**

There was no abuse of discretion in the trial court's denial of a motion to sequester witnesses where the one instance of alleged conformation of testimony was not confirmed by examination of the testimony.

**3. Appeal and Error—satellite-based monitoring—oral notice of appeal—not sufficient—certiorari granted**

Defendant did not properly appeal from a lifetime satellite-based monitoring order where he gave only oral notice of appeal, but his petition for a writ of *certiorari* was granted.

**4. Satellite-Based Monitoring—statutory rape—aggravated offense**

The trial court's orders for lifetime satellite-based monitoring (SBM) based on defendant's convictions of statutory rape were affirmed, but orders for lifetime SBM for other offenses were reversed because they did not meet the definition of an aggravated offense. Statutory rape requires the victim to be incapable of consenting as a matter of law, and it has been held that intercourse with a person deemed incapable of consenting as a matter of law is a violent act.

**5. Evidence—testimony—allegations substantiated—other evidence**

There was error, but not plain error, in a prosecution for indecent liberties and other offenses in the admission of testimony that

the Department of Social Services had substantiated the allegations of abuse. There was other evidence of guilt and the jury would probably have reached the same result without the testimony.

Appeal by defendant from judgments entered 22 September 2010 and on Petition for Writ of Certiorari to review orders entered 22 September 2010 by Judge James U. Downs in Haywood County Superior Court. Heard in the Court of Appeals 12 October 2011.

> *Attorney General Roy Cooper, by Assistant Attorney General Laura E. Crumpler, for the State.*

> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Emily H. Davis, for defendant appellant.*

McCULLOUGH, Judge.

On 22 September 2010, William Thomas Sprouse ("defendant") was convicted of five counts of statutory rape, four counts of statutory sex offense, nine counts of taking indecent liberties with a child, and nine counts of sexual activity by a substitute parent. On appeal, defendant contends the trial court erred by (1) denying his motion to dismiss one count of statutory sex offense and one count of sexual activity by a substitute parent; (2) denying his motion to sequester witnesses; (3) ordering lifetime satellite-based monitoring; and (4) admitting certain testimony of a Department of Social Services ("DSS") social worker. We find no prejudicial error in defendant's trial, and we affirm the trial court's orders of lifetime satellite-based monitoring as to defendant's convictions for statutory rape. However, we reverse the trial court's lifetime satellite-based monitoring orders as to defendant's remaining convictions.

## I. Background

The State's evidence at trial tended to show the following facts. The minor child victim in the present case, A.B., was born in Hendersonville, North Carolina, on 25 September 1992. A.B.'s mother first met defendant when she was pregnant with A.B., and defendant was present when A.B. was born. Thereafter, A.B.'s mother sporadically cohabitated with and dated defendant until October 2003.

In the summer of 2005, when A.B. was thirteen years old, she stopped living with her mother and came to live with defendant. At that time, defendant's girlfriend and future wife, Raquel Sprouse ("Raquel"), was also living with defendant. Raquel's two biological

STATE v. SPROUSE

[217 N.C. App. 230 (2011)]

daughters also lived in the home. A.B. agreed to live in defendant's home because of the other children living in the residence. In describing her relationship with defendant, A.B. testified, "He was like a dad to me."

Thereafter, in December of 2005, A.B. and defendant were watching television on a couch in their home when defendant began talking to A.B. about sex. Defendant told A.B. how to have sex and asked A.B. if she had ever had sex. Then defendant lifted the back end of A.B.'s shorts and proceeded to have vaginal intercourse with her. During the intercourse, A.B. told defendant "no" and "stop," and she tried to push herself away from defendant, but defendant pulled her back and told her it was okay and that it would not hurt. Defendant told A.B. not to tell anyone about the incident or he would kill himself or A.B. before he would rot in jail.

A few days later, A.B. was alone in the home with defendant and requested his permission to leave the house. After being asked his permission, defendant requested that A.B. "give him head." A.B. informed defendant that she didn't know what he meant, so defendant pushed A.B. down on her knees, inserted his penis into her mouth, and pushed her head, forcing her to perform oral sex on him.

Sometime between 25 December 2005 and 24 March 2006, A.B. again entered defendant's bedroom and asked for permission to go somewhere. Defendant responded that she could go if she would "give him [her] ass." Defendant then pushed A.B.'s head down into the pillows where no one could hear her and had anal sex with her. A.B. screamed for defendant to stop, and at some point, defendant let A.B. go. A.B. left defendant's bedroom and went into Raquel's youngest daughter's bedroom, where she cried from the pain that resulted from the incident. A.B. then went to the bathroom and wiped herself, noticing blood on the toilet paper.

During this same time period, A.B. again requested permission from defendant to go somewhere with Raquel's oldest daughter. Defendant told A.B. the only way she would be able to go was if she "sucked his dick." Defendant then forced A.B. to perform oral sex on him for approximately ten minutes until he ejaculated on her shirt. A.B. did not tell anyone about these first four incidents because she was scared. A.B. testified to multiple other sexual encounters with defendant that occurred during the time period from Christmas of 2006 to the end of May 2008.

At the end of May 2008, A.B. was thrown out of defendant's home because defendant did not like A.B.'s boyfriend. A.B. then went to live with her grandmother for a short while before moving in with her boyfriend and his mother, Diane Jones ("Jones"), who were neighbors of defendant. In November of 2008, A.B. told Jones that in order to get permission to go anywhere, she was forced to have sex with defendant. Jones confronted defendant with A.B.'s allegations, which defendant denied. A.B. then left Jones' home in December of 2008 due to DSS involvement with A.B.'s mother, and A.B. was placed with defend-ant's stepmother.

In March of 2009, A.B. ran away from defendant's stepmother's home and returned to Jones' home after having ingested multiple pre-scription pills in an attempt to overdose. Jones left shortly after A.B. arrived; A.B.'s boyfriend then broke up with A.B. and also left the premises. While sitting alone in Jones' home, A.B. noticed a gun sit-ting on her boyfriend's bedside table. A.B. picked up the gun to shoot herself, but the gun was not loaded. Police were called, and A.B. was then taken to Copestone, a mental health facility. During her stay at Copestone, A.B. was interviewed by Linda Opalewski ("Opalewski"), an investigative and assessment worker in the forensic unit at the Buncombe County Department of Social Services ("BCDSS"); during this interview, A.B. told Opalewski about defendant's sexual abuse. After interviewing A.B., on 1 April 2009, Opalewski contacted Detective James Marsh ("Detective Marsh") of the Haywood County Sheriff's Department and gave him a detailed statement concerning the disclosures A.B. had made to her during the interview at Copestone. Opalewski also gathered information, ran criminal record checks, and contacted witnesses based on her interview with A.B. After Opalewski completed her investigation, BCDSS concluded that A.B.'s claims of sexual abuse by defendant were substantiated.

On 8 April 2009, a social worker with the Haywood County Department of Social Services ("HCDSS") came to defendant's resi-dence to discuss the allegations A.B. had made about him. On 13 April 2009, HCDSS returned to defendant's home, took Raquel's youngest daughter away for safety reasons, and placed her in kinship care. Shortly thereafter, defendant devised a plan for Raquel and him to tat-too each other's genitals and say the tattoos had been there for years to "blow [A.B.'s] story out of the water." Defendant used India ink and a sewing needle to put a tattoo of a rose on Raquel's vagina, and Raquel used the same items to put a tattoo of a bumblebee on defend-ant's penis.

After receiving the report from Opalewski, Detective Marsh interviewed A.B. about the allegations of sexual abuse against defendant and corroborated her story with certain other individuals. On 28 April 2009, defendant was arrested by Detective Marsh. After his arrest, defendant asked Detective Marsh if A.B. had informed him of defendant's penis tattoo. Detective Marsh then called A.B. to ask her about the tattoo, and she told him there was no tattoo on defendant's penis.

While in jail, defendant asked Raquel to contact several "friends" to serve as witnesses for him. Defendant specifically requested Raquel to convince one witness, Casey Burris ("Burris"), to testify that she had been a sexual partner of theirs and to verify that defendant and Raquel had gotten their tattoos six years prior. However, Burris met with Detective Marsh and informed him that Raquel was trying to get her to lie to the police about having seen the tattoos.

On 3 June 2009, Detective Marsh had Burris make a recorded pretextual phone call to Raquel. During the phone call, Burris told Raquel that if Raquel wanted Burris to lie about the tattoos, Burris would have to know what kind of tattoos Raquel and defendant had. Raquel stated the tattoos were a flower and a bumblebee. Based on the conversation, Detective Marsh obtained a search warrant and seized Raquel's cell phones, which contained text messages between Raquel and Burris as well as identifying information for the individuals being contacted by Raquel.

Thereafter, on 3 July 2009, Raquel contacted Detective Marsh and told him that she had put the bumblebee tattoo on defendant's penis just weeks before he was arrested. Nonetheless, defendant maintained that he had had the bumblebee tattoo since either the Fall of 2003 or the Spring of 2004. However, photographs taken of Raquel performing oral sex on defendant during a hotel stay in January 2007 showed that defendant had no tattoo on his penis as of that time.

Further, after defendant was arrested and charged, he also asked Raquel to contact Chris Gagner ("Gagner"), a member of the "Outlaws" motorcycle club, and ask Gagner to kill A.B. At first, Gagner requested the sum of $10,000 or defendant's motorcycle as the price for killing A.B., but Gagner then changed his mind and stated that he wanted "nothing to do with it."

On 15 June 2009, defendant was indicted on five counts of statutory rape, four counts of statutory sex offense, nine counts of indecent liberties, and nine counts of sexual activity by a substitute par-

ent. At trial, the State presented the testimony of A.B., Jones, Opalewski, Raquel, Burris, and Detective Marsh to establish the foregoing events. Defendant testified on his own behalf and denied ever engaging in any sexual acts with A.B.

On 22 September 2010, the jury returned a verdict of guilty on all charges. The trial court sentenced defendant to a minimum of 288 months and a maximum of 355 months for each of the five statutory rape offenses and each of the four statutory sex offenses, to run consecutively; the trial court consolidated the nine counts of indecent liberties with a child for judgment, sentencing defendant to a concurrent term of 19 to 23 months; and the trial court consolidated the nine counts of sexual activity by a substitute parent for judgment, sentencing defendant to a concurrent term of 29 to 44 months. The trial court also ordered defendant to enroll in lifetime satellite-based monitoring for all offenses. Defendant gave oral notice of appeal to this Court.

## II. Motion to dismiss

[1] Defendant first contends the trial court erred in denying his motions to dismiss one charge of statutory sex offense under N.C. Gen. Stat. § 14-27.7A(a) and one charge of sexual activity by a substitute parent under N.C. Gen. Stat. § 14-27.7(a), for the period of 25 December 2005 to 24 March 2006. Defendant maintains that the trial court erred in denying the motions to dismiss because the State failed to establish the element of anal penetration.

When a defendant makes a motion to dismiss, the trial court must determine whether there is "substantial evidence" of (1) the essential elements of the offense charged, and (2) the defendant's being the perpetrator of the offense. *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " and is a question of law for the trial court. *Id.* at 66, 296 S.E.2d at 652 (quoting *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980)). In making this determination, our courts must view the evidence in the light most favorable to the State and give the State "the benefit of all reasonable inferences" to be drawn therefrom. *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992).

Defendant challenges one count each of the charges of statutory sex offense under N.C. Gen. Stat. § 14-27.7A(a) and sexual activity by a substitute parent under N.C. Gen. Stat. § 14-27.7(a). N.C. Gen. Stat. § 14-27.7A(a) (2009) provides: "A defendant is guilty of a Class B1

felony if the defendant engages in . . . a sexual act with another person who is 13, 14, or 15 years old and the defendant is at least six years older than the person[.]" *Id.* Accordingly, a person guilty of this offense (1) engages in a sexual act other than vaginal intercourse, (2) with a child who is 13, 14, or 15 years old, and (3) the defendant is at least six years older than the child. *Id.* N.C. Gen. Stat. § 14-27.7(a) (2009) provides: "If a defendant who has assumed the position of a parent in the home of a minor victim engages in . . . a sexual act with a victim who is a minor residing in the home, . . . the defendant is guilty of a Class E felony." *Id.* Thus, a person guilty of this offense (1) assumes the position of a parent in the home of a person less than 18 years old and (2) engages in a sexual act (3) with a person less than 18 years old residing in the home. *Id.* A "sexual act" is defined by N.C. Gen. Stat. § 14-27.1(4) (2009) and includes "cunnilingus, fellatio, analingus, or anal intercourse." *Id.* All that is required for proof of anal intercourse is penetration, however slight. N.C. Gen. Stat. § 14-27.10 (2009).

In the present case, defendant states that he was charged with and convicted of a statutory sex offense and sexual activity by a substitute parent based on the alleged incident of anal intercourse that occurred between 25 December 2005 and 24 March 2006. Defendant maintains the State did not present proof of anal penetration sufficient to establish anal intercourse. We disagree.

At trial, A.B. testified as to two separate incidents of sexual contact during the time period from 25 December 2005 to 24 March 2006. First, A.B. testified there was an incident of "anal sex." A.B. testified that defendant "didn't like go all the way, just a little bit." A.B. testified that defendant pushed her down onto the bed and pressed her head down into the pillows "where nobody could hear [her]." A.B. testified defendant then "got behind [her]," "pushed [her] head down into the pillow," and "inserted his penis barely like not a lot, into [her] butt." A.B. testified that she started screaming for him to stop during the incident. She also testified that she went into an adjacent bedroom afterwards and cried "[b]ecause it hurt." A.B. testified that she then went into the bathroom to wipe herself and "there was blood on the toilet paper."

Defendant cites *State v. Hicks*, 319 N.C. 84, 352 S.E.2d 424 (1987), for the proposition that the State was required to prove actual penetration of A.B.'s anal opening, rather than merely her "butt," or buttocks. In *Hicks*, "[t]he *only* evidence introduced by the State tending to show the commission of any [sexual act] was [the victim]'s ambiguous testimony that defendant 'put his penis in the back of me.' " *Id.* at

90, 352 S.E.2d at 427 (emphasis added). Unlike *Hicks*, however, A.B. testified that defendant "inserted his penis . . . into [her] butt," however slight, that the incident was painful, and that A.B. wiped blood from the area immediately after the incident. A.B.'s testimony in the present case constituted more than one ambiguous statement, as was the case with the victim's testimony in *Hicks*. Taken as a totality, A.B.'s testimony was substantial evidence from which a jury could find that defendant penetrated the anal opening during the incident. *See State v. Estes*, 99 N.C. App. 312, 316, 393 S.E.2d 158, 160 (1990) (holding that child's testimony that the defendant put his penis in the "back" of her and that by "back" the child meant "where I go number two," taken as a totality, was sufficient to establish anal penetration). Thus, viewed in the light most favorable to the State, defendant's motions to dismiss the two charges based on this incident were properly denied.

### III. Motion to sequester

**[2]** Defendant next contends the trial court abused its discretion in denying his motion to sequester witnesses. Defendant maintains this was prejudicial error because Raquel conformed her testimony to that of another witness at trial.

A denial of a motion to sequester witnesses is reviewed for an abuse of discretion. *State v. Call*, 349 N.C. 382, 400, 508 S.E.2d 496, 507 (1998). The trial court's denial of the motion "rests within the sound discretion of the trial court" and must not be overturned unless the defendant can show that "the ruling was so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 400, 508 S.E.2d at 507-08.

In this case, defendant has shown no abuse of discretion. Defendant only points to one instance where Raquel allegedly conformed her testimony to that of a hotel clerk who had testified after she had originally testified, but before she was recalled by the State. During her original testimony, Raquel testified that the family had stayed with her father "for a day or two" before moving into an old fire station after their home had burned down on 16 December 2006. Subsequently, a hotel clerk testified that defendant had been a registered guest at his hotel on 2 January 2007, during that time period. After being recalled, Raquel testified that she and defendant had both stayed in the hotel on the evening of 2 January 2007, shortly after the house had burned down, and that they engaged in sexual intercourse and other sex acts while at the hotel. Raquel further testified that she remembered this particular stay at the hotel because she had just

found a bag of old photographs over the weekend which depicted her and defendant engaging in oral sex in the hotel on that date. The photographs were introduced as evidence that defendant did not have a tattoo on his penis as of 2 January 2007, contrary to his testimony. In light of her discovery of the photographs and her extensive testimony as to her memory of the timeline of those photographs, we fail to see how Raquel conformed her testimony to that of the hotel clerk.

As defendant has noted no other instance where he might have been prejudiced by the trial court's denial of his motion to sequester the witnesses, we hold the trial court did not abuse its discretion in doing so. Nonetheless, we note that our Supreme Court has stated "[t]he [better] practice should be to sequester witnesses on request of either party unless some reason exists not to." *State v. Anthony*, 354 N.C. 372, 396, 555 S.E.2d 557, 575 (2001) (alterations in original) (internal quotation marks and citation omitted).

## IV. Satellite-based monitoring

### A. Appealability

**[3]** Before we address the merits of defendant's third issue on appeal, we must first determine if his appeal from the trial court's lifetime satellite-based monitoring ("SBM") orders is properly before this Court. In the present case, defendant gave oral notice of appeal at the conclusion of the trial court proceedings. However, this Court has previously held that an " 'oral notice pursuant to N.C.R. App. P. 4(a)(1) is insufficient to confer jurisdiction on this Court' in a case arising from a trial court order requiring a litigant to enroll in SBM." *State v. Cowan*, ___ N.C. App. ___, ___, 700 S.E.2d 239, 241 (2010) (quoting *State v. Brooks*, ___ N.C. App. ___, ___, 693 S.E.2d 204, 206 (2010)). Rather, a defendant seeking to challenge an order requiring his enrollment in SBM must give written notice of appeal in accordance with N.C.R. App. P. 3(a) in order to properly invoke this Court's jurisdiction. *Brooks*, ___ N.C. App. at ___, 693 S.E.2d at 206. Because defendant gave only oral notice of appeal in this case, he failed to properly appeal the trial court's SBM orders to this Court.

In recognition of his failure to properly appeal the trial court's SBM orders, defendant petitioned this Court for the issuance of a writ of certiorari authorizing appellate review of his SBM-related issues. "The writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action[.]" N.C.R. App. P. 21(a)(1) (2011). Here,

through no fault of his own, defendant failed to timely file a written notice of appeal as to the trial court's SBM orders. Given these circumstances, we conclude that we should, in the exercise of our discretion, grant defendant's petition for writ of certiorari and review defendant's challenge to the trial court's SBM orders.

### B. Lifetime satellite-based monitoring: Aggravated offense

**[4]** Defendant contends that the trial court erred in ordering lifetime SBM. Defendant maintains the lifetime SBM orders are in error because defendant's convictions were not for aggravated offenses.

When an SBM order is appealed, this Court reviews both the trial court's findings of fact to determine whether the findings are supported by competent record evidence, as well as the trial court's conclusions of law for legal accuracy and to determine whether those conclusions reflect a correct application of the law to the facts found. *State v. McCravey,* ___ N.C. App. ___, ___, 692 S.E.2d 409, 418, *disc. review denied,* 364 N.C. 438, 702 S.E.2d 506 (2010).

Here, the trial court found that all 27 of defendant's convictions were "aggravated offenses" as defined by N.C. Gen. Stat. § 14-208.6(1a) and ordered that upon completion of defendant's sentence, defendant was required to enroll in SBM for his natural life, pursuant to N.C. Gen. Stat. § 14-208.40A. N.C. Gen. Stat. § 14-208.6(1a) (2009) defines an "aggravated offense" as

> any criminal offense that includes either of the following: (i) engaging in a sexual act involving vaginal, anal, or oral penetration with a victim of any age through the use of force or the threat of serious violence; or (ii) engaging in a sexual act involving vaginal, anal, or oral penetration with a victim who is less than 12 years old.

*Id.* "[W]hen making a determination pursuant to N.C.G.S. § 14–208.40A [regarding the SBM requirement], the trial court is only to consider the elements of the offense of which a defendant was convicted and is not to consider the underlying factual scenario giving rise to the conviction." *State v. Davison,* 201 N.C. App. 354, 364, 689 S.E.2d 510, 517 (2009), *disc. review denied,* ___ N.C. ___, 703 S.E.2d 738 (2010). Thus, our review is limited to comparing the statutory definition of "aggravated offense" to the elements of defendant's charges: statutory rape and statutory sex offense under N.C. Gen. Stat. § 14-27.7A(a); taking indecent liberties with a child under N.C. Gen. Stat. § 14-202.1; and sexual activity by a substitute parent under N.C. Gen. Stat. § 14-27.7(a).

First, this Court has already held that the offense of taking indecent liberties with a child is not an aggravated offense for purposes of lifetime SBM. *Davison*, 201 N.C. App. at 363, 689 S.E.2d at 516.

Next, the elements of statutory rape and statutory sex offense under N.C. Gen. Stat. § 14-27.7A(a) are: (1) vaginal intercourse or a sexual act; (2) with a child who is 13, 14, or 15 years old; and (3) the defendant is at least six years older than the child. In addition, the elements of sexual activity by a substitute parent under N.C. Gen. Stat. § 14-27.7(a) are: (1) the defendant assumes the position of a parent in the home of a person less than 18 years old; (2) defendant has vaginal intercourse or engages in a sexual act; (3) with a person less than 18 years old residing in the home. Notably, as defendant argues, none of the elements of these offenses include either the use of force or the threat of serious violence or that the victim be less than 12 years old, as required for aggravated offenses under N.C. Gen. Stat. § 14-208.6(1a).

However, in support of its argument that the trial court's lifetime SBM order was appropriate because the charge of statutory rape is an aggravated offense, the State relies on our opinion in *State v. Clark*, No. COA10-403 (N.C. Ct. App. Apr. 19, 2011). *Clark* analyzed whether the offense of first-degree rape, which requires that the victim be under the age of 13, qualified as an aggravated offense for purposes of lifetime SBM. *Id.*, slip op. at 19, 21. In *Clark*, this Court cited our Supreme Court for the proposition that "'rape is a felony which has as an element the use or threat of violence[.]'" *Id.*, slip op. at 25 (alteration in original) (quoting *State v. Holden*, 338 N.C. 394, 404, 450 S.E.2d 878, 883–84 (1994) (citations omitted)). Based on this reasoning, *Clark* specifically holds that "a child under the age of 13 is inherently incapable of consenting to sexual intercourse," and that "an act of sexual intercourse with a person deemed incapable of consenting as a matter of law is a violent act," thereby qualifying as an aggravated offense for lifetime SBM purposes. *Id.*, slip op. at 26.

Here, the State argues that a statutory rape offense, like the offense of first-degree rape involved in *Clark*, is also an "aggravated offense" because statutory rape requires the victim to be 13, 14, or 15 years old, and therefore statutorily incapable of consenting as a matter of law. We agree with the State and see no meaningful distinction between the two rape offenses for purposes of lifetime SBM. *See State v. Anthony*, 351 N.C. 611, 615-17, 528 S.E.2d 321, 323-24 (2000) (discussing the similarities in purpose behind the offenses of first-degree rape and statutory rape and holding that, under both offenses,

the child victim is statutorily incapable of consenting to sexual intercourse). In *Anthony*, our Supreme Court expressly noted "[t]he term 'statutory rape' has a particularized meaning as an offense committed against a victim legally incapable of giving consent to sexual intercourse because of age or other incapacity." *Id.* at 618, 528 S.E.2d at 324. Thus, given our recent holding in *Clark* that "an act of sexual intercourse with a person deemed incapable of consenting as a matter of law is a violent act," we must affirm the trial court's orders of lifetime SBM based on defendant's convictions of statutory rape. *Clark*, No. COA10-403, slip op. at 26. However, we reverse the trial court's lifetime SBM orders as to the remaining convictions, as they do not meet the definition of an aggravated offense.

## V. Admission of testimony

**[5]** Finally, defendant contends the trial court committed plain error by allowing DSS social worker Opalewski to testify that there had been a substantiation of sex abuse of A.B. by defendant. Defendant maintains this was plain error because the testimony constituted impermissible opinion vouching for A.B.'s credibility and that without the testimony, it is probable that the jury would have reached a different result.

When an alleged evidentiary error is not preserved in a criminal case, this Court may apply plain error review. *State v. Hammett*, 361 N.C. 92, 98, 637 S.E.2d 518, 522 (2006). Plain error is found "only in exceptional cases where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *Id.* (internal quotation marks omitted). In order to establish that the trial court committed "plain error," the defendant must convince this Court that the alleged error "tilted the scales" against the defendant, *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986), and that absent the alleged error, "the jury probably would have returned a different verdict." *State v. Davis*, 321 N.C. 52, 59, 361 S.E.2d 724, 728 (1987).

Defendant cites the case of *State v. Giddens*, 199 N.C. App. 115, 681 S.E.2d 504 (2009), *aff'd*, 363 N.C. 826, 689 S.E.2d 858 (2010), in support of his argument that Opalewski's testimony constituted impermissible opinion testimony. In *Giddens*, as in the present case, a DSS social worker testified that her investigation had substantiated the defendant as the perpetrator of the abuse alleged by the two child

victims. *Id.* at 117-18, 681 S.E.2d at 506. This Court held that the DSS social worker's testimony was "clearly improper" because:

> [The DSS social worker]'s testimony that DSS had 'substantiated' Defendant as the perpetrator, and that the evidence she gathered caused DSS personnel to believe that the abuse alleged by the children did occur, amounted to a statement that a State agency had concluded Defendant was guilty. . . . Although [the DSS social worker] was not qualified as an expert witness, [the DSS social worker] is a child protective services investigator for DSS, and the jury most likely gave her opinion more weight than a lay opinion.

*Id.* at 121-22, 681 S.E.2d at 508. Thus, this Court concluded "it was error to admit [the DSS social worker]'s testimony regarding the conclusion reached by DSS." *Id.* at 122, 681 S.E.2d at 508. *Giddens* also found the error did in fact rise to the level of plain error in that case, because "without [the DSS social worker]'s testimony, the jury would have been left with only the children's testimony and the evidence corroborating their testimony." *Id.* at 123, 681 S.E.2d at 509.

We agree with defendant that given our holding in *Giddens*, the trial court committed error in admitting the challenged testimony of Opalewski. Here, Opalewski testified that "the department [DSS]'s decision was the substantiation of sex abuse of [A.B.] by [defendant]." As in *Giddens*, Opalewski based her testimony on a DSS investigation, which included interviewing collateral contacts, gathering information, and conducting criminal record checks. Thus, as in *Giddens*, Opalewski's testimony that DSS had substantiated the allegations of abuse in the present case was not properly admitted.

Nonetheless, we conclude the error does not rise to the level of plain error in the present case. Unlike *Giddens*, absent the challenged testimony, the present case involved more evidence of guilt against the defendant than simply the testimony of the child victim and the corroborating witnesses. Aside from the testimony of A.B. and the witnesses corroborating her testimony, the following evidence was presented at trial: testimony by Raquel that shortly after A.B. filed charges against defendant, defendant "manipulat[ed]" Raquel to tattoo his penis in order to "blow [A.B.'s] story out of the water"; defendant asked Raquel to contact Burris in an effort to get Burris to lie about having seen the tattoo during the time period associated with the allegations by A.B.; photographs of defendant's penis, coupled with Raquel's testimony, showed that he did not have a tattoo as of 2 January 2007, despite the fact that he testified he did have the tattoo

**STATE v. SPROUSE**

[217 N.C. App. 230 (2011)]

as early as 2003 or 2004; and defendant tried to have A.B. killed after charges were filed against him.

In its entirety, the additional evidence regarding defendant's actions after he was charged with the crimes in the present case, coupled with the extensive testimony by the victim and the other corroborating witnesses, leads us to conclude that without the challenged testimony of Opalewski, the jury probably would have reached the same verdict. Thus, although the trial court erroneously admitted the testimony of Opalewski, we are not convinced the error tilted the scales against defendant, and therefore does not rise to the level of plain error.

## VI. Conclusion

We hold the State presented sufficient evidence of anal penetration such that the trial court properly denied defendant's motions to dismiss one count of statutory sex offense and one count of sexual activity by a substitute parent based on the anal sex incident during the time period of 25 December 2005 to 24 March 2006. We also find no abuse of discretion in the trial court's denial of defendant's motion to sequester witnesses. Having granted defendant's petition for a writ of certiorari as to the trial court's lifetime SBM orders, we affirm the trial court's lifetime SBM orders finding defendant's five convictions for statutory rape to be aggravated offenses in light of our holding in *Clark*. However, we reverse the trial court's orders requiring defendant to enroll in lifetime SBM for his remaining convictions, as those offenses do not meet the definition of an aggravated offense. Finally, we hold that, although it was error for the trial court to admit the testimony that DSS had substantiated the allegations of abuse in light of our decision in *Giddens*, the error does not rise to the level of plain error in the present case given the overwhelming evidence against defendant.

No prejudicial error in part, affirmed in part, and reversed in part.

Judges STEELMAN and ERVIN concur.