An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-970
NORTH CAROLINA COURT OF APPEALS

Filed:  20 May 2014

STATE OF NORTH CAROLINA

v.

GUSTAVO GASPAR,
    Defendant.

Wayne County
Nos. 11 CRS 055331-32

Appeal by defendant from judgments entered 2 November 2012 by Judge Arnold O. Jones, II in Wayne County Superior Court. Heard in the Court of Appeals 17 February 2014.

> *Roy Cooper, Attorney General, by Kathleen N. Bolton, Assistant Attorney General, for the State.*
>
> *Mark Montgomery, for defendant-appellant.*

MARTIN, Chief Judge.

Defendant Gustavo Gaspar was charged in true bills of indictment with two counts of statutory rape of a thirteen-year-old child, one count of statutory sexual offense of a thirteen-year-old child, one count of felonious rape of a child by an adult offender, and one count of taking indecent liberties with a child.  He appeals from judgments entered upon jury verdicts

finding him guilty of the charged offenses. We find no prejudicial error.

The evidence presented at trial tended to show that, from the time that defendant's biological daughter, M.G., was eleven years old until she was thirteen years old, defendant sexually abused her. M.G. testified that defendant had vaginal intercourse with her "more than five times," and also made her perform oral sex on him. M.G. said that defendant made her perform these acts in the family residence that she shared with defendant, her stepmother, and her younger sister and brother, as well as in the fenced-in shelter on the property where a horse was kept ("the horse barn"), in and around the garage located about twenty feet from the residence where defendant did general mechanic work, and at a motel.

M.G. testified that the first time defendant sexually abused her was at nighttime in the family's residence, the evening before the family was planning to go to the beach. M.G. testified that she was asleep in her bed when she awoke to defendant touching her "[i]n [her] private parts." M.G. said that defendant was drunk at the time and that her sister was asleep in the next bed in the same room while defendant fondled her.

On another occasion, defendant told M.G. to go with him so

that they could clean up trees and debris that had fallen around the horse barn during a recent storm. After they finished picking up the debris, the two went inside the horse barn and defendant "asked [M.G.] if [she] wanted to have sex with him." M.G. testified that she told defendant "no, because [she] was on [her] period." She testified that, in response, defendant "told [her] to give him oral sex." She further testified that, "when he was done he told [her] to get out of the little barn," which she did, and said that defendant stayed there. M.G. testified that while she had been in the horse barn with defendant, her stepmother was inside the residence and her brother and sister were playing outside.

M.G. also testified about a time when defendant was working outside and told M.G. to go behind a pick-up truck that was parked outside the garage; when she did so, defendant told her he wanted to have sex with her. M.G. told him "no, because [her] [step]mom was inside and [she] didn't want to do it like in front of like—outside. [She] just didn't want to do it." Defendant told her "not to be scared," and told her that if she had sex with him, that "he'll give [her] something that [she] needed." Defendant then pulled down his pants, unbuttoned her pants, put on a condom, and had vaginal intercourse with her. When he was finished, defendant told M.G. to go inside the house

and he stayed by the pick-up truck. When she went back in the house, M.G. did not tell her stepmother, because she said she was afraid and "didn't want to get out of [her] family" and she "wanted [the family] to be together." The next day, defendant gave M.G. twenty dollars, which M.G. testified she received in exchange for having sex with defendant behind the truck the day before.

On another occasion, after school, while M.G. was working for defendant as a mechanic in his garage, and while her younger sister and brother were still at school, defendant told M.G. that he wanted to have sex with her. M.G. testified that when she refused, defendant said he would give her something if she had sex with him. Then defendant put on a condom and had vaginal intercourse with M.G. in the corner of the garage. M.G. said that when it was over, defendant told her to go outside and defendant stayed in the garage. M.G. testified that defendant kept a toolbox that contained condoms and pornographic videos in the garage. M.G. testified that she did not watch the videos, but that defendant had told her that "if [she] wanted to watch [the videos] to see how to do it because [she] told him [she] don't know how to do that stuff. And he told [her] to watch that movie then."

M.G. also testified that defendant took her to a motel

twice to have sex; once after she finished school for the day, and once during school hours. On the occasion that defendant took M.G. to the motel during school hours, defendant picked her up from school at around 2:00 p.m. and told her that they were going to the auto parts store. Instead, defendant drove to a gas station, bought a soda for M.G. and a box of condoms for himself, and then drove to a motel. M.G. did not remember the name of the motel, but reported that it was a one-level motel on William Street. Before they got out of defendant's vehicle, defendant told her to put on his hoodie so that no one would see her face as she entered the motel. Once they were in the motel room, defendant told M.G. to go to the bathroom to "wash up," and when she was finished in the bathroom, defendant went into the bathroom and took a shower. Defendant then emerged from the bathroom without any clothes on and told M.G., who was also undressed, to get on the bed. He asked her if she wanted to put the condom on for him; when she refused, he put the condom on himself and had vaginal intercourse with M.G. Afterwards, defendant told M.G. to go to the bathroom again to "wash up" and to get dressed, which she did. Defendant told M.G. to put the hoodie back on so that no one would see her face as she left the motel and got into his vehicle.

M.G. testified that defendant often made her perform sexual

acts in exchange for giving her permission to go somewhere she wanted to go or to get something that she wanted to have. On one occasion, M.G. testified that she wanted to go to a dance that was being held at her school, but that defendant "told [her] if [she] wanted to go [she] had to give him something," which she said was "sex."

M.G. reiterated throughout her testimony that, for the two years that defendant sexually abused her, she did not tell anyone because she was afraid and "didn't want to get away from [her] family." When questioned by defense counsel as to why she did not report the sexual abuse and why she wanted to stay with her family when that meant she would also be staying with her father——the man who had been sexually abusing her for two years——M.G. simply said, "But he's my dad." Detective Sergeant Tammy Mozingo with the Wayne County Sheriff's Office testified that M.G. told her that "she loved her dad and she just wanted him to stop having sex with her. That's the only thing that she wanted." M.G. also told the detective sergeant that "her dad had told her in the past that if she told anybody that they wouldn't have anywhere to live, she wouldn't have anywhere to live." She told Detective Sergeant Mozingo that she just "wanted a normal life."

According to her testimony, when M.G. was thirteen, a

friend invited her to go to her house. M.G. declined the invitation, telling the friend that she knew "[t]hat if [she] went to her house[, M.G.'s] dad would have want[ed] something back from [her]." M.G. then told her friend about being sexually abused by defendant and, the next day, M.G. visited her school's health center to report the abuse.

Amanda Whaley Anderson, a nurse who works at the school's health center called the Wish Center, testified at trial that, in the early morning hours of 25 October 2011, M.G. visited the Wish Center and said that she needed to talk to someone. Ms. Anderson said that M.G. "said that her dad had been sexually abusing her over the past year, couple of years. And that she just wanted it to stop. And she didn't know what else to do." She said: "[M.G.] had told a friend of hers because she wanted——she told me she wanted——she was asked to go to this friend's house." "And she didn't want to go because she knew what she would have to do and the friend was the one that encouraged her to come talk to me."

Ms. Anderson invited the school guidance counselor to be present during her conversation with M.G. to have "a second set of ears" to hear M.G.'s statement. Ms. Anderson testified that M.G. went into detail about the sexual abuse perpetrated against her by defendant. She testified that M.G. reported that

defendant "had been asking her for favors any time she would get minutes on her cell phone or the privilege of going to a school dance or something like that that she would have to perform sexually for him." Ms. Anderson testified that, based on the account given to her by M.G., the abuse occurred "a lot."

Ms. Anderson testified that M.G. told her about an incident when defendant "signed her out of school and carried her to a motel in Goldsboro and had sex with her." Ms. Anderson's testimony mirrored M.G.'s account during M.G.'s direct testimony, including that M.G. thought she was being taken out of school to get auto parts but, instead, defendant drove her to a motel, and that this visit to the motel was M.G.'s second with defendant. Ms. Anderson also testified that defendant used condoms when he had sex with M.G., and that he kept condoms in the garage, along with pornographic videos. When asked by the prosecutor whether in the two years that she had known M.G. as a student that she would "characterize her as truthful," Ms. Anderson responded, without objection from defense counsel, "Yes." Ms. Anderson testified that she documented everything that M.G. told her, and reported the information to the Wayne County Department of Social Services ("DSS").

The State also presented the testimony of numerous witnesses, including: Luis Antonio Carrasquillo, Jr., a social

worker supervisor with the Wayne County DSS; Latonya Ann Woodard, an investigator with the Wayne County DSS; Maria-Angelica Taylor, a physician's assistant employed by the TEDI BEAR Children's Advocacy Center; Andora Copeland-Hankerson, a forensic interviewer at the TEDI BEAR Children's Advocacy Center; Donna Anderson, a bookkeeper with M.G.'s middle school; Natvarlal Parmar, the owner of the Carolina Motel; and Detective Larry Norwood Mitchell, Detective Sergeant Robert D. Chunn, and Detective Sergeant Mozingo, each with the Wayne County Sheriff's Office. With the exception of the school bookkeeper, the motel owner, and Detective Sergeant Chunn, who testified about executing the search warrant, each witness recounted how M.G. disclosed to them personally or by way of written statement the same incidents of sexual abuse revealed in M.G.'s direct testimony, sometimes in greater detail than fourteen-year-old M.G. provided while seated in the courtroom in front of the jury.

For instance, Mr. Carrasquillo testified that, on the day that M.G. reported the abuse to Ms. Anderson, he went to the school to interview M.G. and the guidance counselor present during M.G.'s meeting with Ms. Anderson. Mr. Carrasquillo recounted M.G.'s report about the event when defendant picked her up from school and took her to the motel and had vaginal

intercourse with her. Mr. Carrasquillo corroborated M.G.'s account about wearing defendant's hooded sweatshirt so that she would not be recognized, about washing in the bathroom, and about defendant being on the bed "on top of her" and "put[ting] his penis in her for about ten minutes." Further, Mr. Carrasquillo and Ms. Taylor also both testified about M.G.'s disclosure that, when she lived in Mexico at the age of eight or nine, her paternal grandfather also "touched her private parts."

In addition, the bookkeeper from M.G.'s middle school authenticated State's Exhibit 3, which was the school's sign in/sign out log from 10 October 2011, and established that M.G. was signed out from school by defendant at 2:18 p.m. that day. Mr. Parmar then authenticated State's Exhibit 4, which was the customer registration card completed for a room rented on 10 October 2011 by defendant at Mr. Parmar's motel, which is a one-level motel on North William Street in Goldsboro, North Carolina.

Ms. Taylor further testified that, although her examination of M.G. did not reveal physical indications of sexual abuse, the absence of such evidence "neither supports nor discounts the concerns raised by [M.G.'s] clear and consistent disclosure of sexual abuse. The lack of physical findings is not unexpected given the time since the last contact occurred and due to

[M.G.'s] development." Ms. Taylor also testified that, during her physical examination of M.G., she found "lighter pigmented scars, linear scars," which M.G. "told [her] that she marked every time her father did something to her."

When executing a search warrant on defendant's garage, in several toolboxes, detectives found three unopened condoms and X-rated videos, including one titled "Barely 18 # 32," and a case for another video titled "Back Shot Queens Gone Wild." They also found a .22 caliber revolver with the serial number filed off of it. After executing the search warrant, Detective Mitchell and Detective Sergeant Mozingo brought defendant to the sheriff's office for questioning. Once in the station, they advised defendant of his *Miranda* rights, and defendant acknowledged his understanding of those rights and demonstrated his intent to waive those rights. Although defendant "initially denied having sexual intercourse with his daughter," after being shown a copy of the sign in/sign out log from the school, and a copy of the receipt from the motel, Detective Mitchell said that defendant described the incident that occurred at the Carolina Motel. Defendant admitted that "they stopped at a store where he bought some condoms, and then they proceeded out to the Carolina Motel, where he engaged in sexual intercourse and oral sex with his daughter, [M.G.]" Detective Mitchell said that

defendant also described an incident "that occurred inside the garage behind his house." Defendant told the detective that "he was on a roller, which is a device that he uses to roll under cars that he's working on," and that "he was laying on that and he had [M.G.] sit on top of him, and played with her boobies, and they had sexual intercourse and he penetrated her there." Defendant also described another incident that occurred "[j]ust adjacent to and slightly behind the garage is a—he called it a horse barn, and then they—he said there was an incident ah—where they had sex rather inside the horse barn." At the conclusion of the thirty- to forty-five-minute interview, defendant signed his name to the statement transcribed by Detective Sergeant Mozingo, and told Detective Mitchell that "[h]e wanted [the detectives] to understand that it was never forced on [M.G.]; that she wanted him to do that." Detective Sergeant Mozingo also testified that, according to M.G., defendant told M.G. that she looked like her deceased biological mother and said that "that's the reason why he done [sic] these things to her."

The defense offered testimony from defendant's younger brother, Emilio Gaspar, and defendant's wife and M.G.'s stepmother, Imelda Juarez, and then called defendant to testify on his own behalf. Emilio Gaspar testified that he "would

always try to hug [M.G.], but lately she was, like, distracted. [He] would try to give her some advice, but she begin [sic] to be a little rebellious." He also testified that M.G. "changed boyfriends frequently," and that he believed his brother and did not believe M.G. Emilio Gaspar also testified that he did not think M.G. showed "symptoms" of someone who had been raped or sexually abused, in his opinion, because

> she would have her little short shorts or little short shirts and always right around there, and like a normal girl would do, not like someone who was embarrassed or was kind of shy. I mean, if she had been molested by my brother, I mean, I think there would have been a little bit embarrassment or maybe she wouldn't want to come near there. She was always there. And she was helping with the mechanic work, and she did it voluntarily. Voluntarily; it wasn't just because she was forced to or something. So I don't know why this accusation is now here.

Mrs. Juarez testified that M.G. never accepted her as the new wife of her father and said M.G. never listened to her. Mrs. Juarez also testified that, although she first believed M.G. when she accused defendant of sexually abusing her, she said she later changed her mind and testified that she now no longer believes M.G.'s allegations.

Defendant testified on his own behalf. Defendant testified that the X-rated movies and the condoms were just items that he "would find in cars and things and [would keep them]——to see if

the people were going to come and pick them up." Defendant also gave testimony that he signed his name in three places on the *Miranda* form without knowing what the form was,[1] but said that Detective Sergeant Mozingo *did* explain his rights to him and said that he did understand them. Nonetheless, despite defendant's admission that law enforcement officers explained his *Miranda* rights to him, that he signed a form in three places at the sheriff's station, and that when he was questioned by investigators, he "didn't speak with them," "[he] remained silent," defendant appears to have alternatively testified that he has never been interviewed or been asked any questions by anyone identifying themselves as law enforcement officers about M.G.'s allegations prior to trial. Defendant also testified that the reason he brought M.G. to the motel was that he was introduced by the motel owner, Mr. Parmar, to a woman named Shantel who lived at the motel and who wanted someone to work on

---

[1] Defendant was assigned two interpreters during the course of the trial. However, the trial court questioned defendant's need for these interpreters, based on defendant's animated and lengthy discussions with defense counsel in English, as well as his ability to respond to questions before the interpreters finished interpreting them. Nonetheless, the court continued to allow the interpreters to participate in the proceedings. Although defendant's case-in-chief, as well as the State's and defendant's rebuttal evidence, raised challenges to and concerns regarding defendant's ability to understand both written and conversational English, because none of the issues on appeal concern this matter, we do not include any further recitation of the evidence related to this issue.

her vehicle, and said that defendant and M.G. went to the motel "to pick up this car," which is why, defendant explained, that M.G. knew about the motel.

At the close of the State's evidence, defendant moved to dismiss the charges based on his assertion that the State had not met its burden to establish the ages of both M.G. and defendant at the time the offenses were alleged to have been committed, which motions were denied. At the close of all of the evidence, defendant moved to dismiss the charges based on his assertion that there was insufficient evidence that the offenses were perpetrated on the dates identified in the indictments, which motions were also denied. The jury found defendant guilty of each of the charged offenses. The court sentenced defendant to the following consecutive terms of imprisonment: 300 months to 369 months for felonious rape of a child by an adult offender; 240 months to 297 months for each of the two counts of statutory rape of a thirteen-year-old child; 240 months to 297 months for statutory sexual offense of a thirteen-year-old child; and 16 months to 20 months for taking indecent liberties with a child. Defendant appeals.

_____

Defendant first contends the trial court committed plain error when it allowed Ms. Woodard, an investigator with the

Wayne County DSS, to testify that, after conducting her investigation into the allegations that defendant sexually abused M.G., she agreed that she would have characterized such allegations as substantiated. Defendant argues that such testimony constituted impermissible opinion vouching for M.G.'s credibility, and directs our attention to *State v. Giddens*, 199 N.C. App. 115, 681 S.E.2d 504 (2009), *aff'd per curiam*, 363 N.C. 826, 689 S.E.2d 858 (2010), to support his argument. We conclude the admission of the testimony did not constitute plain error.

"For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.'" *Id.* (quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983)).

In *Giddens*, this Court considered whether the trial court committed plain error by allowing a child protective services investigator with the Buncombe County Department of Social Services to testify that her investigation had substantiated the defendant as the perpetrator of the sexual abuse alleged by two

minor children. *Giddens*, 199 N.C. App. at 117, 119, 681 S.E.2d at 506, 507. At trial, the defendant failed to object to this testimony, but argued that the "testimony was admitted in error because it resolved the factual issue of [d]efendant's guilt for the jury by expressing an opinion on [the complainants'] credibility." *Id.* at 119, 120, 681 S.E.2d at 507. Because "the conclusion reached by DSS was not based solely on the children's accounts of what happened, and thus, was not merely a corroboration of their testimony," *id.* at 120, 681 S.E.2d at 507, and because "DSS conducted its own investigation to determine whether any of the children's caregivers were participants in the alleged abuse," *id.* at 120-21, 681 S.E.2d at 507, this Court determined that "[t]he cumulative effect of [the investigator's] testimony was to tell the jury that based upon a thorough investigation, DSS concluded that of the children's three caregivers, [d]efendant had sexually abused them." *Id.* at 121, 681 S.E.2d at 508. Since "[o]ur case law has long held that a witness may not vouch for the credibility of a victim," *id.*, we concluded that "[the investigator's] testimony was clearly improper, as she testified that DSS had concluded [d]efendant was guilty of the alleged criminal acts," *id.*, and "it was error to admit [the investigator's] testimony regarding the conclusion reached by DSS." *Id.* at 122, 681 S.E.2d at 508.

Consequently, we held that it was plain error to admit the investigator's testimony and that the defendant was entitled to a new trial because, "without [the investigator's] testimony, the jury would have been left with only the children's testimony and the evidence corroborating their testimony"——although such was "strong evidence"——and "our prior case law instructs that this alone is insufficient to survive plain error review of the testimony of a witness vouching for the children's credibility." *Id.* at 123, 681 S.E.2d at 509.

We agree with defendant that, in the present case, as in *Giddens*, Ms. Woodard's testimony——which was admitted by the trial court without objection by defendant——that DSS had substantiated the allegations of sexual abuse against defendant was not properly admitted. Nonetheless, unlike *Giddens*, "absent the challenged testimony, the present case involved more evidence of guilt against the defendant than simply the testimony of the child victim and the corroborating witnesses." *See State v. Sprouse*, 217 N.C. App. 230, 242, 719 S.E.2d 234, 243 (2011), *disc. review denied*, 365 N.C. 552, 722 S.E.2d 787 (2012). Here, in addition to M.G.'s detailed testimony and the numerous corroborative witnesses presented by the State, the State also presented evidence from two law enforcement officers that defendant gave a detailed confession——the voluntariness of

which defendant does not challenge on appeal——about three separate occasions during which defendant had vaginal intercourse with M.G., fondled her breasts, put his mouth on her vagina, and had her put her mouth on his penis. The State also admitted into evidence the sign in/sign out log dated 10 October 2011 from M.G.'s middle school, as well as a customer registration card from the same date for a motel room rented by defendant, which corroborated M.G.'s direct testimony and defendant's confession that defendant took M.G. out of school and brought her to the motel to have sexual intercourse with her. Thus, we conclude that defendant's confession, along with the unchallenged independent evidence establishing that defendant took M.G. out of school and then rented a room at Mr. Parmar's motel on the same day, coupled with the extensive testimony by M.G. and by the other corroborating witnesses, the jury probably would have reached the same verdict even without the challenged testimony of Ms. Woodard. *See Sprouse*, 217 N.C. App. at 243, 719 S.E.2d at 244. Thus, although the trial court erroneously admitted the challenged testimony of Ms. Woodard, "we are not convinced the error tilted the scales against defendant, and therefore does not rise to the level of plain error." *See id.*

Defendant next contends the trial court committed plain

error when it allowed Ms. Anderson, the nurse who works at M.G.'s school's health center, to testify without objection as to M.G.'s truthfulness. Defendant asserts that Ms. Anderson was "not formally qualified" as an expert, and that her testimony constituted inadmissible lay opinion testimony. We disagree.

"The credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion as provided in Rule 405(a), but [this evidence is] subject to . . . limitations . . . ." N.C. Gen. Stat. § 8C-1, Rule 608(a) (2013). The limitations to this Rule are: "(1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." *Id.*

In the present case, defendant challenges the following testimony from Ms. Anderson:

> Q. In the time that you knew Maria, would you characterize her as truthful?
>
> A. Yes.

Our review of the context of this exchange shows that Ms. Anderson was not asked whether it was her opinion that M.G. was truthful about her allegations that she was sexually abused by defendant. Rather, Ms. Anderson was asked simply whether, during the two years that she had known M.G. and had seen her

once or twice weekly, she knew M.G. to be "a truthful child." Additionally, Ms. Anderson's now-challenged testimony was offered only after defense counsel had attacked M.G.'s character for truthfulness during his cross-examination of her, which attacks were sufficient to permit the presentation of evidence as to her truthfulness in accordance with the second limitation of N.C.G.S. § 8C-1, Rule 608(a). *See, e.g.*, *State v. Hall*, 98 N.C. App. 1, 10, 390 S.E.2d 169, 174 (1990) (determining that, because "[o]n cross-examination of the victim, the defendant's attorney repeatedly attempted to impeach her by asking her about prior inconsistent statements made to her doctor, her mother, and at the preliminary hearing," such cross-examination of a child alleging she had been raped by her stepfather "constituted an attack on her credibility such that the State could then present reputation or opinion evidence as to the victim's reputation for truthfulness"), *rev'd on other grounds*, 330 N.C. 808, 412 S.E.2d 883 (1992). Accordingly, we conclude that the trial court neither erred, nor committed plain error, when it allowed Ms. Anderson to offer the now-challenged testimony.

Finally, defendant contends the trial court committed plain error when it charged the jury by using the term "victim" to describe the complaining witness. We disagree.

Defendant concedes that the court instructed the jury by using the same language as that which is set forth in the North Carolina Pattern Jury Instructions for the charged offenses, which use the term "victim" to identify the person against whom the charged offenses are alleged to have been committed. Defendant also concedes that defense counsel did not object to the court's use of this term in its instructions to the jury at trial, and that any review of this unpreserved issue must be reviewed for plain error on appeal.

This Court has already concluded that "it is clear from case law that the use of the term 'victim' in reference to prosecuting witnesses does not constitute plain error when used in instructions." *State v. Henderson*, 155 N.C. App. 719, 722, 574 S.E.2d 700, 703, *appeal dismissed and disc. review denied*, 357 N.C. 64, 579 S.E.2d 569 (2003); *see also State v. Richardson*, 112 N.C. App. 58, 67, 434 S.E.2d 657, 663 (1993) ("The word 'victim' is included in the pattern jury instructions promulgated by the North Carolina Conference of Superior Court Judges and is used regularly to instruct on the charges of first-degree rape and first-degree sexual offense."), *disc. review denied*, 335 N.C. 563, 441 S.E.2d 132 (1994). Nevertheless, defendant urges this Court to conclude that the trial court's use of this term in its instruction was

prejudicial in accordance with our decision in *State v. Walston*, __ N.C. App. __, __, 747 S.E.2d 720, 726–28 (2013) (concluding the trial court's use of the term "victim" in its instruction to the jury was prejudicial error), *disc. review denied*, __ N.C. __, __ S.E.2d __ (No. 023P14) (filed Mar. 6, 2014).

Our Court recently considered the same argument on appeal in *State v. Jones*, __ N.C. App. __, __, 752 S.E.2d 212, 214–15 (2013), *disc. review denied*, __ N.C. __, 755 S.E.2d 616 (2014). In *Jones*, we determined that *Walston* was distinguishable because, unlike in the defendant in *Walston*, the *Jones* defendant "made no . . . request to modify the language in the instruction and did not raise any objection to the use of this term at trial," *see Jones*, __ N.C. App. at __, 752 S.E.2d at 215, "there were [no] disputed issues of fact as to whether the sexual offenses even occurred," *see id.*, and the *Jones* defendant "ma[de] no specific argument that he ha[d] suffered any prejudice as a result of the trial court's uncontested use of the term 'victim' in its jury instructions." *See id.*

In the present case, as in *Jones*, defendant did not object at trial to the use of the term "victim" in the jury instructions or request to modify the language of the pattern jury instructions, and does not make any specific argument that he suffered any prejudice, aside from a general assertion that

the use of the term was an "inadvertent bolstering of the complainants' [sic] credibility." We recognize that the defense elicited testimony from Ms. Taylor, the physician's assistant with the TEDI BEAR Children's Advocacy Center who examined M.G., that her examination did not reveal physical indications of sexual abuse, which is similar to one of the facts in *Walston* that this Court considered when determining that the use of the term "victim" was prejudicial error. *See Walston*, __ N.C. App. at __, 747 S.E.2d at 727. Nevertheless, we are not persuaded that this alone is sufficient to overcome the distinctions between the present case and *Walston*. Thus, as we did in *Jones*, we conclude that *Walston* is distinguishable from the present case, *see Jones*, __ N.C. App. at __, 752 S.E.2d at 215, and hold that the trial court did not commit plain error when it used the term "victim" in its instruction to the jury.

No prejudicial error.

Judges ELMORE and HUNTER, JR. concur.

Report per Rule 30(e).