STATE v. BLACK

[223 N.C. App. 137 (2012)]

---

STATE OF NORTH CAROLINA v. PATRICIA ANN BLACK, Defendant

No. COA11-1342

(Filed 16 October 2012)

## 1. Appeal and Error—plain error review—not cumulative

Under plain error review, each of the challenged parts of an expert's testimony was reviewed separately; the plain error rule is not applied cumulatively.

**2. Evidence—expert testimony—opinion on victim's credibility**

There was no plain error in a prosecution for various sexual offenses where an expert social worker testified that she thought the victim was telling the truth and the trial court immediately struck the testimony from the record and instructed the jury to disregard it. Such action was sufficient to alleviate any prejudice.

**3. Evidence—expert opinion—credibility of victim—not material**

There was no plain error in a prosecution for various sexual offenses where an expert social worker essentially asserted that the victim was a sexually abused child even though the State presented no physical evidence of physical abuse. The expert's opinion that the abuse occurred and that the victim was believable was not material considering other evidence and contentions that the expert told the victim what to say while treating her. It was unlikely that the jury would have reached a different result without the challenged evidence.

**4. Constitutional Law—effective assistance of counsel**

Defendant did not establish sufficient prejudice for an ineffective assistance of counsel claim where there was insufficient evidence of prejudice for plain error.

**5. Evidence—testimony about prior DSS hearing—explanation following cross-examination**

There was no plain error in a prosecution for various sexual offenses in admitting testimony from a social worker about a prior hearing on a neglect and sexual abuse petition by DSS involving one of the victims in this prosecution. Prior to the challenged testimony, defendant cross-examined two other victims about their testimony at the the Department of Social Services (DSS) hearing and it was not improper for the State to ask the DSS social worker to explain what that prior hearing was and why it took place.

**6. Evidence—admissions—not extrinsic impeachment evidence**

There was no plain error in a prosecution for various sexual offenses in admitting statements made by defendant to a social worker because the testimony constituted admissions admissible as substantive evidence rather than extrinsic impeachment evidence.

**STATE v. BLACK**

[223 N.C. App. 137 (2012)]

Appeal by defendant from judgments entered 17 May 2011 by Judge Richard D. Boner in Lincoln County Superior Court. Heard in the Court of Appeals 5 April 2012.

*Attorney General Roy Cooper, by Assistant Attorney General Margaret A. Force, for the State.*

*Mark Montgomery for defendant-appellant.*

GEER, Judge.

Defendant Patricia Ann Black appeals from judgments entered on her convictions of various sex offenses involving three alleged victims. On appeal, she primarily contends that the trial court committed plain error in allowing one of the State's expert witnesses to give testimony improperly vouching for the credibility of one of the prosecuting witnesses. Although we agree that admission of certain portions of the testimony was error, we hold that defendant has failed to demonstrate sufficient prejudice to establish plain error.

Facts

The State's evidence tended to show the following facts. Defendant and her husband, Jimmy Black, were the parents of two children, "Deborah" and "John."[1] Deborah is mentally retarded with an IQ of about 60. Deborah testified that when she was 12 years old, her father had sexual intercourse with her. Deborah told defendant what had happened, but her mother did nothing. Mr. Black had sexual intercourse with her again when she was 14 years old. In addition, on another occasion, Mr. Black watched Deborah take a shower even though she asked him to leave. Defendant and Mr. Black told Deborah not to tell anyone what Mr. Black had done, or they would go to jail.

Defendant shaved Deborah's pubic hair until sometime after she turned 14 years old. Defendant claimed that the shaving took place until Deborah was 11 or 12 because Deborah was taking growth hormones that caused very thick pubic hair. The doctor's records, however, showed that the growth hormones were stopped when Deborah was eight years old, and other relatives confirmed that defendant was still shaving Deborah when she was 14. Additionally, defendant gave Deborah a purple vibrator to use to masturbate and told others that Deborah had been masturbating since she was seven or eight years old.

---

1. Throughout this opinion, the pseudonyms "Deborah," "John," "Mary," and "Sarah" are used to protect the identities of minor witnesses and for ease of reading.

Deborah confided to her cousin Mary about what her father had done. Mary and Deborah went to school together. Deborah told Mary: " 'My daddy's been touching me with his stuff.' " When Mary told defendant and Mr. Black what Deborah had said, they told Mary it was not true, and, then, according to Mary, they "got on [Deborah] for saying that it was."

From mid-2007 to August 2008, Mary spent 150 to 200 nights with Deborah's family. On Mary's 13th birthday, in July 2007, Mary spent the night at the Black family's house. After the other children had gone to bed, defendant and Mr. Black asked Mary to have sex with the two of them. Although she initially refused, Mr. Black threatened her, and she agreed.

Defendant, Mr. Black, and Mary went to the Blacks' bedroom where defendant touched Mary's breasts and inserted two fingers in Mary's vagina. Mr. Black engaged in sexual intercourse with both defendant and Mary. On subsequent occasions, Mary smoked marijuana and drank beer with defendant and Mr. Black. They also gave Mary Xanax, which she identified as a blue pill. Mary would wake up in the morning between them unable to remember what had happened. Deborah confirmed that when she got up, she sometimes saw Mary sleeping with defendant.

A third girl, Sarah, who was also 13, went to middle school with Deborah. Sarah spent the night at the Blacks' home two or three times. During the first visit, defendant and Mr. Black asked her if she was bisexual, and she said "[y]es." On her second visit, defendant and Mr. Black gave her alcohol to drink and a blue pill. She later got up after everyone had gone to bed and found Mr. Black watching pornography in the living room. After Mr. Black threatened to kill Sarah, she agreed to have sex with him. He took her behind the kitchen counter, told her to take her pants off, and engaged in sexual intercourse with her.

In addition, defendant took a shower with Sarah and, afterwards, Sarah had a "threesome" with defendant and Mr. Black, during which defendant touched Sarah's vagina with her tongue and Mr. Black had sexual intercourse with Sarah. Subsequently, defendant and Mr. Black got angry when Sarah said she would not engage in the sexual conduct anymore, and they would not let her see Deborah.

The Department of Social Services ("DSS") initiated an investigation in August 2008 when it received a report that Sarah had made allegations against defendant and Mr. Black. Sandra Huneycutt, a DSS

social worker, and Jim Etters, a detective with the Lincoln County Sheriff's Department, interviewed Sarah. Later, Sarah was interviewed on videotape at the Child Advocacy Center.

After questioning Sarah, Ms. Huneycutt and Detective Etters went to the Blacks' home. When they arrived, defendant, Mr. Black, John, Deborah, and Mary were all there. Defendant, Deborah, and Mary were all wearing matching tank tops from "Hooters." Defendant and Mr. Black were told that DSS had received a report involving the two of them. Before defendant and Mr. Black heard any details of the report, defendant told them that she suspected that Sarah had made the allegations, and defendant then called Sarah a "whore and . . . a slut." When asked about her drug use, defendant indicated she had a prescription for Xanax, which is a blue pill.

After Mr. Black was arrested, Ms. Huneycutt interviewed Mary. Mary told Ms. Huneycutt about what had happened to her and also that Deborah had confided in her about sexual incidents with her father. Mary had not previously reported the incidents to anyone because Mr. Black had threatened that she would come up missing. She later told her father (Mr. Black's cousin) about what had happened, but did not tell him all the details because he had a temper.

Ms. Huneycutt then went back to the Blacks' house and talked to them again about Deborah. They denied that anything had occurred, but cooperated in finding another place for Deborah and John to stay. Deborah and John went to stay with their paternal grandmother, Betty Black. The grandmother subsequently told Ms. Huneycutt that she did not believe Deborah's story and that Deborah could no longer stay with her. Deborah then went to stay with Kathy Black, her paternal great-aunt, for two months. She returned to her grandmother for six months, but was placed in foster care in May 2009.

In September 2008, Deborah began seeing Nadia Antoszyk, a licensed clinical social worker. During therapy, Deborah used dolls to show what had happened to her. Deborah expressed love for her parents and missed them. She was sad about being cut off from her family and felt blamed for her parents being in jail. Her grandmother told Deborah often that she did not believe Deborah, she discouraged Deborah from talking to Ms. Antoszyk, and threatened Deborah that she would be removed, making Deborah anxious and conflicted by loyalty to her family. Deborah had imaginary friends and characteristics consistent with child abuse—anger, social withdrawal, frequent masturbation, and behavior that was sexually provocative.

Once Deborah was in a foster home and new school, her anxiety· level and ability to pay attention improved. The number of imaginary friends she had decreased, and Deborah did not mention them as often. While Deborah had recanted at times and said she had lied, once she was in a foster home, she did not make any other statements suggesting that she had lied about her parents.

Defendant was indicted for first degree statutory rape/sex offense with a 14 year old, felony child abuse for aiding and abetting Mr. Black in engaging in sexual intercourse with Deborah, felony child abuse inflicting serious injury, incest with a 14 year old for aiding and abetting Mr. Black in engaging in carnal intercourse with Deborah, and indecent liberties with a child by aiding and abetting Mr. Black.

Defendant was also indicted with regard to Mary for conspiracy to commit incest with a 13, 14, or 15 year old, conspiracy to commit statutory rape/sexual offense with a 13, 14, or 15 year old, statutory rape/sexual offense of a 13, 14, or 15 year old by aiding and abetting Mr. Black in engaging in vaginal intercourse with Mary, statutory rape/sexual offense with a 13, 14, or 15 year old for engaging in a sexual act with Mary, indecent liberties with a child, and first degree kidnapping.

For offenses against Sarah, defendant was indicted for conspiracy to commit statutory rape/sexual offense with a 13, 14, or 15 year old, two counts of statutory rape/sexual offense with a 13, 14, or 15 year old by aiding and abetting Mr. Black to engage in a sexual act with Sarah, two counts of statutory rape/sexual offense with a 13, 14, or 15 year old for engaging in a sexual act with Sarah, indecent liberties with a child, and first degree kidnapping.

At trial, defendant testified on her own behalf and denied the allegations. She also presented evidence that tended to show that Deborah stood up in church on one occasion and, while crying, said that she had lied and told her parents that she was sorry. Defendant presented other evidence that Deborah told a cousin that her mother did not do anything and that Nadia Antoszyk was trying to put words in her mouth. John testified that he had seen Ms. Antoszyk several times, but stopped because she called his family "dysfunctional" and tried to put words in his mouth, making him angry. Defendant also presented evidence that Deborah told her grandmother that she hated meeting with Ms. Antoszyk and that Ms. Antoszyk would make her say things she did not want to say. According to defendant's wit-

nesses, Deborah told her grandmother, including in a family therapy session, that she had lied and put her mother and father in jail. In addition, defendant presented evidence that Deborah had said that the devil raped her and that Deborah hit her grandmother and shoved her into a bookcase.

Defendant pointed out differences in Mary's and Sarah's testimony at trial from their testimony during a DSS proceeding. Defendant elicited testimony that Sarah was living in a group home for out-of-control behavior and missing school. Defendant also presented evidence that Deborah was not allowed to see Sarah anymore because Deborah had told them that Sarah was showing her breasts on the internet and wanted Deborah to do that too. In addition, when defendant had Sarah kicked out of a pool, Sarah threatened, "Bitch, I will put you both in jail."

Defendant was convicted of three counts of aiding and abetting statutory rape, two counts of conspiracy to commit statutory rape, two counts of first degree sexual offense, two counts of first degree kidnaping, three counts of taking indecent liberties with children, and two counts of felony child abuse. The trial court arrested judgment on the two counts of first degree kidnapping and sentenced defendant for second degree kidnapping. The trial court also arrested judgment as to one count of felony child abuse and dismissed the incest of a child charge. Defendant timely appealed to this Court from the judgments imposed based on the convictions.

I

[1] Defendant first contends on appeal that the trial court committed plain error in admitting certain portions of the testimony of the State's expert witness, Nadia Antoszyk. Defendant argues that Ms. Antoszyk improperly vouched for Deborah's credibility.

As our Supreme Court has observed:

> the plain error standard of review applies on appeal to unpreserved instructional or evidentiary error. For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional

case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations and quotation marks omitted).

With respect to expert witness testimony in sex offense cases, our Supreme Court has held:

In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility. However, an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith.

*State v. Stancil*, 355 N.C. 266, 266-67, 559 S.E.2d 788, 789 (2002) (internal citations omitted).

In this case, social worker Nadia Antoszyk was allowed to testify as an expert in the field of diagnosing and treating mental health disorders and child and family therapy. Because we are reviewing for plain error, we consider separately each part of Ms. Antoszyk's testimony that defendant challenges. *See State v. Dean*, 196 N.C. App. 180, 194, 674 S.E.2d 453, 463 (2009) ("[T]he plain error rule may not be applied on a cumulative basis, but rather a defendant must show that each individual error rises to the level of plain error.").

[2] Defendant first points to Ms. Antoszyk's testimony that "I do not think that she is lying. I think it truly, truly happened." The trial court, on its own motion, struck the testimony from the record and instructed the jury to disregard the offending statements. As our Supreme Court has observed, "[i]f an unresponsive answer produces irrelevant or incompetent evidence, the evidence should be stricken and withdrawn from the jury." *State v. Keen*, 309 N.C. 158, 162, 305 S.E.2d 535, 537 (1983). Such action is sufficient to alleviate any prejudice suffered by defendant. *State v. Kennedy*, 320 N.C. 20, 32, 357 S.E.2d 359, 367 (1987) ("Furthermore, although [the expert medical witness] was permitted to testify as to her diagnosis of physical and sexual abuse of the victim, this testimony was later struck and the jury instructed to disregard it. Thus, any error with respect to that testimony was harmless."). Therefore, defendant has failed to show plain error as to this testimony.

**[3]** Defendant more persuasively challenges subsequent testimony of Ms. Antoszyk. In response to a question about Deborah's treatment, Ms. Antoszyk answered in part: "For a child, that means . . . being able to, um, come to terms with all the issues that are consistent with someone that has been sexually abused." In addition, Ms. Antoszyk testified on multiple occasions regarding her conclusion that the sexual abuse experienced by Deborah started at a young age, perhaps age seven, and continued until she was removed from the home by DSS.

Further, when asked why Deborah had lashed out at her grandmother, she explained that the behavior was "part of a history of a child that goes through sexual abuse." With respect to her concerns about the adequacy of the grandmother's caregiving, Ms. Antoszyk testified: "She had every opportunity to get the education and the information to become an informed parent about a child that is sexually abused." And, when asked if it was reasonable for the grandmother to have some doubt as to Deborah's story given Deborah's recanting on multiple occasions, Ms. Antoszyk responded: "With me, there was no uncertainty."

In *State v. Towe*, 365 N.C. 56, 60, 732 S.E.2d 564, 566, (2012), our Supreme Court reviewed the admission of expert testimony in a sex offense trial that " 'approximately 70 to 75 percent of the children who have been sexually abused have no abnormal findings, meaning that the exams are either completely normal or very non-specific findings, such as redness' " and that the expert would place the victim in that category of children despite the absence of physical evidence of sexual abuse. The Court noted that "the only bases for [the expert's] conclusory assertion that the victim had been sexually abused were the victim's history as relayed to [the expert] by the victim's mother and the victim's statements to [another testifying expert] that were observed by [the expert]." *Id.* at 62, 732 S.E.2d at 568, 2012.

The Court concluded that the evidence relied upon by the expert was, under *Stancil*, "standing alone . . . insufficient to support an expert opinion that a child was sexually abused." *Id.* Consequently, the expert's "testimony was improper when she stated that the victim

fell into the category of children who had been sexually abused but showed no physical symptoms of such abuse." *Id.*

We cannot meaningfully distinguish the testimony of Ms. Antoszyk we have quoted above from the testimony found improper by the Supreme Court in *Towe.* Each time, Ms. Antoszyk effectively asserted that Deborah was a sexually abused child even though the State had presented no physical evidence of abuse. The testimony was, therefore, improperly admitted.[2] The question remains, however, whether the admission of the testimony rises to the level of plain error.

In *Towe*, the Supreme Court, when finding plain error, pointed out that because the only direct evidence against the defendant was the victim's testimony, the "case turned on the credibility of the victim." *Id.* at 63, 732 S.E.2d at 568. After noting that the victim's statements regarding the incidents at issue were not "entirely consistent," the Court reviewed the State's extensive examination regarding the expert's credentials. *Id.* The Court then concluded: "In light of [the expert's] unquestioned stature in the fields of pediatric medicine and child sexual abuse, and her expert opinion that, even absent physical symptoms, the victim had been sexually abused, we are satisfied that [the expert's] testimony stilled any doubts the jury might have had about the victim's credibility or defendant's culpability, and thus had a probable impact on the jury's finding that defendant is guilty." *Id.* at 64, 732 S.E.2d at 569.

Here, although Deborah, who is mentally retarded, recanted her accusations at times prior to being removed from the influence of her family and placed in foster care, her testimony at trial was consistent with her pre-trial reports of sexual abuse. The State also presented other circumstantial evidence corroborating her allegations, including defendant's providing Deborah as a child with a vibrator, defendant's admission that Deborah started masturbating at age seven or eight, and defendant's shaving Deborah's pubic hair. The State countered defendant's explanation offered at trial for that behavior with defendant's admissions to DSS employees, contrary testimony from other defense witnesses, and Deborah's medical records.

---

2. Defendant has also cited other testimony that we believe does not vouch for Deborah's credibility, but rather falls in line with permissible testimony that Deborah exhibited symptoms or characteristics consistent with the profiles of sexually abused children.

In addition, Deborah did not provide the only direct evidence against defendant. Mary and Sarah also testified regarding defendant's participation in sex offenses committed against them. While some details of their descriptions of what occurred varied over time, their descriptions of the sex offenses remained essentially consistent, and the two girls testified to very similar experiences. Further, Ms. Antoszyk did not examine or treat either Mary or Sarah, and her testimony did not vouch for their credibility.

Of equal importance is the difference in how the expert in this case was treated at trial compared to the expert in *Towe*. The *Towe* expert appeared—without dispute by the defense—as a universally-recognized expert in child sex abuse consulted regularly by other doctors and health care providers. Here, the heart of the defense's case as to the charges involving Deborah was that Ms. Antoszyk had "put words in" Deborah's mouth.

Defendant presented witnesses who testified that Deborah specifically told them that Ms. Antoszyk was putting words in her mouth and trying to get her to say things she did not want to say. In addition, Deborah's brother testified that he stopped going to see Ms. Antoszyk because she was trying to put words in his mouth. Defendant also presented the director of a program providing services to people with special needs who testified about how Ms. Antoszyk had upset Deborah and her brother by telling them their family was "dysfunctional."

Defendant combined this evidence with witnesses testifying that Deborah publicly stated that she had lied about her parents and testimony from a teacher and a counselor that Deborah had never mentioned anything to them. Further, when questioning Ms. Antoszyk, defense counsel suggested that it was her intention to have Deborah removed completely from the Black family: "But you wanted her removed from the Black family entirely from about the very beginning, didn't you?"

In sum, the defense presented a direct assault on Ms. Antoszyk's role in the case. Ms. Antoszyk's insistence that Deborah was sexually abused and believable was immaterial to the defense because the defense was contending that Ms. Antoszyk was the moving force behind Deborah's accusations by telling Deborah what to say. Given this vigorous defense, when combined with the direct evidence from Mary and Sarah and the corroborating evidence as to Deborah's allegations, we cannot conclude that the jury would probably have

reached a different verdict in the absence of Ms. Antoszyk's improper testimony. Defendant has, therefore, failed to demonstrate plain error.

**[4]** Although defendant also argues that she was denied effective assistance of counsel when her attorney failed to object to Ms. Antoszyk's testimony, because defendant failed to show sufficient prejudice for plain error, she also failed to establish prejudice for purposes of her ineffective assistance of counsel claim. *State v. Phillips*, 365 N.C. 103, 147-48, 711 S.E.2d 122, 153 (2011) (holding that trial court's error was harmless and, therefore, defense counsel's action did not constitute ineffective assistance), *cert. denied*, ___ U.S. ___, 182 L. Ed. 2d 176, 132 S. Ct. 1541 (2012).

II

**[5]** Defendant next contends that the trial court committed plain error in admitting the following testimony from Ms. Huneycutt, the DSS social worker:

> Q. Tell me about court—last year in court. What—what kind of court was there last year? What was the purpose of that court?
>
> A. . . . [I]n May of 2009, it was determined that [Deborah] did need to come into custody of Lincoln County DSS. So at that point in time, there was an adjudication for the court, for DSS court.
>
> Q. Which . . . had to do with what?
>
> A. Which had to do—. . . the petition was filed, . . . that [Deborah] was neglected, sexually abused and a dependent.

Defendant argues that this testimony should have been excluded under *State v. Martinez*, 212 N.C. App. 661, 664, 711 S.E.2d 787, 789 (2011) (holding that trial court improperly admitted testimony by DSS social worker that DSS had substantiated claim that sex offense occurred), and *State v. Giddens*, 199 N.C. App. 115, 122, 681 S.E.2d 504, 508 (2009) (finding plain error when child protective services investigator testified that agency's investigation uncovered evidence indicating that alleged abuse and neglect did occur), *aff'd per curiam*, 363 N.C. 826, 689 S.E.2d 858 (2010).

It is, however, well established that "[w]here one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, *even though such latter evidence would be incompetent or irrelevant had*

*it been offered initially." State v. Albert,* 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981) (emphasis added). Here, before Ms. Huneycutt testified, defendant, when cross-examining both Mary and Sarah, had established that they had testified previously in a 2009 DSS hearing and asked about their prior testimony, pointing out inconsistencies.

It was not improper, given this cross-examination, for the State to ask the DSS social worker to explain what that 2009 hearing was and why it took place. Accordingly, the admission of Ms. Huneycutt's testimony was not plain error.

## III

**[6]** Finally, defendant contends that the trial court committed plain error by allowing the prosecutor to use extrinsic evidence to impeach defendant with prior inconsistent statements on collateral matters. On cross-examination, defendant denied that she had told anyone (1) that Deborah began masturbating at an early age, (2) that she had given Deborah a vibrator, or (3) that she had taught Deborah how to masturbate. The State called Ms. Huneycutt in rebuttal to testify that defendant had told her that Deborah had started masturbating at age seven or eight and that defendant had said that she gave Deborah a vibrator to use in the privacy of her room.

In support of her contention, defendant relies upon *State v. Williams,* 322 N.C. 452, 368 S.E.2d 624 (1988), in which the defendant's brother had testified on behalf of the defendant. During cross-examination by the State, the brother denied telling his probation officer that the defendant had admitted the crime. *Id.* at 453, 368 S.E.2d at 625. On rebuttal, the State called the brother's probation officer and a second witness to testify that the brother had in fact told the officer that the defendant admitted the crime. *Id.* at 454, 368 S.E.2d at 625.

Our Supreme Court held that

> [the brother's] testimony concerning what he did or did not tell his probation officer was collateral to the issues in the case; therefore, it was improper to impeach him on this point by offering the testimony of [other witnesses]. [The witnesses'] testimony was not offered to prove that defendant had, in fact, made the alleged statements to [the brother]. Rather, the testimony was offered solely to contradict [the brother's] testimony that he had not told [the probation officer] that defendant made these statements. While the *substance* of those

statements and whether defendant made them would be mate-
rial, whether [the brother] had *told* anyone about defendant's
statements is clearly collateral.

*Id.* at 456, 368 S.E.2d at 626.

*Williams* addresses impeachment. Under the hearsay rule, N.C.R.
Evid. 801, an out-of-court statement is inadmissible if offered for the
truth of the matter asserted. However, as the Court acknowledged in
*Williams*, a witness may be impeached by confronting him with prior
out-of-court statements inconsistent with his trial testimony.
*Williams*, 322 N.C. at 455, 368 S.E.2d at 626. It is well established that
"[p]rior statements of a witness which are inconsistent with his pre-
sent testimony are not admissible as substantive evidence because of
their hearsay nature. Even so, such prior inconsistent statements are
admissible for the purpose of impeachment." *State v. Mack*, 282 N.C.
334, 339-40, 193 S.E.2d 71, 75 (1972) (internal citations omitted).

This case does not, however, involve prior inconsistent state-
ments admitted solely to impeach the witness. Instead, defendant's
prior statements to Ms. Huneycutt were admissible as substantive
evidence. Rule 801(d) of the Rules of Evidence provides: "A state-
ment is admissible as an exception to the hearsay rule if it is offered
against a party and it is (A) his own statement, in either his individual
or a representative capacity . . . ." Therefore, defendant's statements
to Ms. Huneycutt constituted admissions that were admissible as sub-
stantive evidence, and *Williams* does not apply. The trial court prop-
erly admitted Ms. Huneycutt's rebuttal testimony.

No error.

Judges ELMORE and THIGPEN concur.